Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and All right, Mr. Brine, did I say that correct? Brine, glad to hear from you. Morning, Your Honors. Morning. I'm Burt Brine. I'm representing Dr. Jon Oberg, a relator and, in this case, an appellant. This is the second time this panel has had this matter before it in the first. You don't need reminders of that. Right. Fair enough. And we would have been happy not to come back with the correct result below as well. In the previous decision, the Court addressed framework, the analytical factors which could be used to determine whether a particular state-owned entity created by the state and operating a business venture was to be deemed a state agency on the one hand and thus not a person within the meaning of the False Claims Act or other than a state agency and therefore a person within the meaning of the Act. And the Court said that the four Hoover factors, which are non-exclusive, which are used to determine whether an entity is an arm of the state would be equally useful in this context. So you've made law for the Fourth Circuit, aligning it in a many other circuits. Upon that determination, plaintiff sought and secured permission to amend his complaint to more realistically describe the operations and status of the three defendants that remain in the case. And based on those pleaded facts and taking them into account as they had to, the defendants continued to move based on the statutes which they had put before the Court the agencies. The question today is whether on the well-pleaded facts of the complaint and the reasonable inferences to be drawn therefrom, Dr. Oberg has plausibly stated facts which could lead to the conclusion that these entities are other than state agencies. If that is the case, there's no basis for the grant of a 12b6 motion and the case has to be reversed and remanded. That's the clear because it came up the last time that Dr. Oberg was not a moving party. He opposed the 12b6 motion and stood on his complaint and he is entitled to the assumption that the well-pleaded facts are true and the inferences therefrom. Certainly in the district court's opinion, there's no indication that the district court was doing other than trying to make a freewheeling determination of what he thought the entities were without regard to the the bounds of the a flaw which we've pointed out and but this court is certainly free at this time to look at the complaint to look at the facts pleaded therein and to see how they would in the court's judgment fall out under the four non-exclusive Hoover factors. So I would like if the court will indulge me to talk about each of those factors, what is said about about those operations in the These factors are not determinative in and of themselves. They are factors that are looked to to answer two fundamental questions which the Supreme Court has said are the pillar of arm of the state. One is what's the impact of any judgment likely to be on the state treasury, on the ability of the state to conduct its ordinary business and second how is the dignity of the state affected by having these entities brought before a federal court and made answerable for claims that false claims against the federal government. Those are the two base questions and the Supreme Court has said the various factors are used to answer those two fundamental inquiries. I think what we've established is there is no potential impact on the state treasuries as such and I'll explain why and that given the way the states have set up these entities and allowed them to conduct nationwide business under the supervision of their boards of directors with the state holding only indirect and shareholder type powers, the dignity of the states is not involved in this case. It is not an insult to their dignity to make these entities accountable for their business actions. So I think is it possible as I understood your introduction you are going to go factor by factor. We have three states here and for my own purposes it might be useful to go state by state. If you can't do that though I understand that you prepared your argument. No I'm happy to do it. I mean and of course I just want to be clear we're not talking about the states we're talking about the entities. I understand but I was shorthand manner talking about the entities from three different states. Correct. There you go. But there are certain things that are in common. So when we turn to the treasury factor and we can say one by one is there any obligation imposed on the states by state law to fund these entities and importantly to meet their obligations and losses because in that factor the court has to take account of the supreme court's decision in Hess. In Hess Justice Ginsburg was applying arm of state test to PATH which is an entity created under in a compact but she did analyze the arm of the state factors and in addressing the treasury factor she said you don't focus on profits and surpluses that is the investment benefit to the state that might accrue from a successful operation. You focus on debts and losses and ask is the state going to be accountable for debts and losses. Now in each of these cases the states have sealed themselves off intentionally saying we are not responsible. Not responsible for paying their bonds. We're not responsible for paying their debts. We are not putting forth a statement of responsibility. There's no record in any of the three states that I'm talking about the state level now that they have provided continuing financial support for the operations. The dominant lending operations and acquisition of loan operation conducted by these entities. So you can't show it on a statutory basis. You can't show it on a historical basis and when we look at the realistic risk assessment do these entities have the resources to meet any judgment that might be entered in the case you come to the same conclusion. So if you're trying to determine can there be an impact on the functioning of the state government through its treasury no matter which of the three entities whether it's FIA or VSAC or ASLA there is no commitment by the states. No one can point to one. You can speculate about what they might do but speculation isn't the same as demonstration and there's no history of the responsible for the payment of interest and principal on loans where the state had historically pumped money into the ports authority in order to create a better port system for the state. There's nothing that's happened over the history of these entities that shows that there's any commitment by the state to pay. So I think on that factor and again it's not determinative because the Supreme Court says you've got to look at them all. On that factor there's no real basis to determine that the states are put at risk and as the 11th amendment contemplated for their essential operation because the 11th amendment after all is intended to say you cannot use the full courts to jeopardize the continuing viability and function of the states. So I don't think on that fact there's any difference between these entities. Now they do have and they have made arguments which are largely circular. They say well if the state says that you have to put your money in the state treasury now it's state money and therefore that's the end of the argument because it'll always be paid with state money. But those are assumptions of conclusion. The fact that the state acts as their depository put your money here even though you control it we can't use it for other state purposes. It's yours. Well it's not accurate though in every case that the authorities absolutely control the expenditures is it? No. I mean like in Pennsylvania doesn't the governor have to approve bond issues? He has to approve bond issues. There's a statutory limit on how much debt can be incurred so it's not quite as black and white as you're saying is it? Well I think that the question here is you know who's going to meet the obligations? Once the governor has. In terms of what doesn't autonomy have to be considered as well? I mean you're you're looking at the one treasury factor but it seems to me that you know you case law is pretty clear that that isn't a single predominant factor that you have to look at the others. And I've said that and we agree with that. And let me address autonomy because autonomy has several sub-factors in case law. One of which is some degree of control. How do these and particularly historically how have they controlled these activities? I mean these entities have broad scope of authority. They're directors can pretty much go into any business they like that's within the general. Directors are in almost every case appointed by the governor or some other state official. And as I read the cases that would count against you in with respect to autonomy. Well I think it's clear that if they were appointed locally it would be a different case. And and what we've recognized that but the real question is is that a means of exercising control? Are those directors carrying out the protecting the entity and acting in a fiduciary capacity? And I think if we looked at the record of how these entities have operated they're really the second. And one important part of the autonomy factor is where does your money come from? Are you self-sustaining? And certainly in Hess that was a very important consideration for Justice Ginsburg. She said this is an operating entity. You generate your own funds even though part of its overhead was directly furnished by the states. And it so says but she made it a major consideration that they could sell fund because if you pay the piper you call the tune. If the entity generate their funds with approval well from the governor. Not entirely because there are two kinds of operations. They do servicing operations and right now that's a very important part of their function. They don't need any approval to go into servicing businesses. They do need approval to issue bonds but they can also make loans that are not in the form of bonds as we showed in the case of Arkansas and they don't need approval. And the real question is is that approval a serious consideration by the state or is it a pro forma exercise really not protecting the function of the entity but looking at the overall financial picture in the state and certain federal restrictions particularly on loans that are issued on a tax-free basis. So I think that again that's something that could be tested in reality. What is the real world limitation on these enterprises? They are able to grow triple their activity with no record or no interference by the state in very short order. They have tremendous real world latitude and I think the cases say you can't just look at this abstractly. You have to look at whether they're operating as arms of the state in the real world. And so in all of these cases as the facts pleaded show they radically changed the composition of their activities in order to take advantage of this federal benefit. There's no indication that the states were asked or approved or even considered it. The states are investors and they're certainly interested in making money with these enterprises but that a state investment does not transform an entity into a state agency. And so that if we you know the fourth factor which is how are they treated under state law. A couple of things that really kind of stick out in that regard. They are given this broad latitude. They're given you know enormous power to conduct any enterprise they want. So they're not treated as a closely controlled agency. They don't have state officials as such directly managing them because even in port authority the governors had veto power under the actions of the path. There was a direct reporting responsibility. The governors appointed all of the directors. So that can't be determinative in and of itself. And what the states did here was to empower them very broadly and the states permitted them and particularly in the case of fiat. One of the things with the courts have looked at under this factor is how the state court treats the entity and the state court treats each of these entities as a state agency. Well now you may not agree with those decisions and there have been circuit courts that haven't agreed with that but I don't I haven't found a court that has said that that way in favor of saying that they're treated under state law as a state agency. Now if you have a case that says that doesn't matter I'd be delighted to hear about it. Well I'm not going to tell you that it doesn't matter that it's not one of the many things you take it into account. The only thing we're looking at now is the even though you told us you were going to do it I thought you said to me you were going to do it state by state you haven't done that. All right. And so you argued that all these states are exactly the same you know all God's children are the same and I actually don't think they are all the same but that's you that's your choice to argue the case whatever way you want to. But with respect to how they're treated under state law they are all the same because state courts maybe the decision was a long time ago but the state courts have treated all of these agencies at one time or another as state agents. I think if we differentiate that agency by agency that FEA has a track record of being treated for certain purposes by state courts of state agencies. As you know from Ram Ditta and the same is true in Hess that is a factor and has to be considered. It is not determinative. None of these things are determinative. Absolutely. It'd be good if the Supreme Court decided what was determinative but now nothing is. Then if you look at ASLA Arkansas's entity it's slightly different. They have some dicta but they don't have a direct holding by a state court and in the case of Vermont there is no state court treatment. There is nothing to rely upon except speculation as to what a state court might say. But Pennsylvania is really strong isn't it in terms of its appellate decisions. It says FEA is the commonwealth. I mean the case is uniformly the court is not only referring to FEA as an agency but it describes it as the commonwealth and then describes it as akin to a department, department administrative board and commission and other agencies of this doesn't seem to be any ambiguity in how the courts treat it. So isn't this something we have to pay attention to? And I said it is certainly a factor. I don't think as I said in the beginning you have two paramount questions. What's the impact on treasury? How is the dignity of the state involved? And this is I don't think we're not disputing that you can take it into account. I do think. Why isn't it a strong consideration in terms of the Pennsylvania appellate decision? I think that what you see in Ramditta there was a direct holding by the Maryland courts that the parks and planning commission was a state agency. It was a direct holding and the court said yes it is but this is ultimately a question of federal law. So you look at the the whole network of treatment. State courts may for the purposes of the lawsuits in front of them say yes we're going to treat this as the commonwealth, the state personnel. That's what they've said. But that is not in and of itself a determinative factor. And just as I think we would say and our opponents would say. When was this decided? Do you remember? Which case is this? The state court cases holding this is a state agency under state law in Pennsylvania. That's right in Pennsylvania. I think some of them are quite old. I think they are old and I think your argument probably would be that this agency has changed in its identity function etc since that time. Well it's radical. But you haven't made that argument so go right ahead. Well I think I'd certainly accept to throw my arms around it. They are old cases. I think they're premised on the formalism of ownership. Well some of them are from the 80s though. I mean I don't know about you but I remember the 80s. What about FIA has changed in your understanding to make those cases no longer applicable? Starting in the 80s. These entities went from being primary lenders to being financial players. The advent of asset-backed securities radically changed the nature of their operations. They were set up and if you look back they're set up in the 70s. The idea was you'd raise money and lend money directly to students in your state or who were graduating and moving on to other states. When they got into asset-backed securities which gave them the ability to go in the secondary market and buy loans as financial assets without regard to whose loan it was, where it originated, where it was going to be paid. That changed, expanded, just completely, if you want to put it modern terms, morphed the nature of the operation. So you're saying they're different creatures. Quite different. And certainly if you look at their financial history they're radically different. That is something this court has to take into account because the question is what were they at the time that the alleged offense was committed because that's in the words of the act. A person has to commit the fraud. So the question is when you did the act, were you a person? So I see I'm running into my time and I'll desist. We'll hear from the other side. Thank you. You've got some time remaining on the floor. Thank you. Happily. May it please the court, it's an honor to be here again. My name is Dan Hugh and I represent the Pennsylvania Higher Education Assistance Agency. With me today is Bart DeLone. Mr. DeLone is a The guiding principle in this case was articulated by the court in the Oberg decision as follows. The critical inquiry is whether the entity at issue is truly subject to state control to render it a part of the state. Deciding this critical inquiry using the words subject to means that this critical inquiry can be accomplished by looking at the state's laws alone. That our is an arm of the state is one of the holdings of the regions of California and DOE Supreme Court decision where the DOE court said, and I'm paraphrasing, the question whether a particular state agency is an arm of the state is a question of federal law. But that federal law can be answered only after considering the provisions of state law that define the agency's character. So the Supreme Court has instructed that in determining the arm of the state, you look to the state laws to determine the agency's character. This is not a new approach for this court. This is precisely the approach that the court used in Hoover and used in Maryland Stadium Authority when the court determined that both of those entities were arms of the state. Now Mr. Oberg's new allegations in his fourth amendment do not alter this approach at all. They do not alter the approach that in deciding the critical inquiry, the court should look to the state's laws alone. This case has never been about the sufficient Mr. Oberg's pleading a person, but it can't be because the state's laws alone are what determine whether or not FEA is a state agency. This case is far too important to depend on Mr. Oberg's creative pleading where he simply extracts arguments from his briefs and imports them into his amended complaint. Nevertheless... How do you respond though to the argument that leaving the statutes aside and the requirements for the governor's approval and statutory limits on spending and things like that, that the Pennsylvania cases are old cases and we're talking about an agency that has changed so much that we can't really accord much weight to those cases? Well the cases are not that old I think as your honor pointed out, but there's a recent case, in fact it's a 2013 case, it's an eastern district of Pennsylvania federal case called Lange and in Lange the issue was under state law whether FEA was qualified to be qualified for the state's sovereign immunity statute and in making that determination the Lange court held this year that FEA was a state agency. Now with regard to the change... Is that case cited in your papers? Yes it is your honor. Okay. With regard to FEA's change there's been no change here. Every activity that FEA... Well the amount according to your own reports, the amount of money that you are controlling has changed enormously. I can't even, I can't believe it with a straight face you're not saying, you're not, you're denying that. Well I don't deny what the financial statements hold, but let me finish. Well and don't they aren't, don't they reveal just exactly what I said? Well your honor, they reveal that FEA has made money over the years, but if you look at... No, no, no, not made money, I mean I should make so much money in the way that they have made money. They are a national player, as you put it now, where they weren't at their outset. Isn't that true? The answer is yes and no. No? Yes. The answer is that do they conduct activities outside the state of Pennsylvania? Yes. Does any state university do that? Does the University of Maryland do that? Of course they do. Well what did you say in your report about how much of your business was outside the state? I don't think there's a breakdown of how much there is outside the state. I think you said in the report about two years ago that what, more than 25 percent was outside the state? Your honor, the, the, I don't call that report, if that's what the report said, I certainly have no reason to disagree with that, but, but let me, let me point your honor to the simple fact that the state's statutes authorize FEA to do business out of state. So the state... There's nothing wrong with doing business out of state, but this isn't a small bank, Pennsylvania bank. I think what's important to recognize is what does FEA do with the revenue that it has earned? Yes, do it, does its revenue exceed expenses? Yes. But what does it do with that money? It uses that money to fulfill its statutorily imposed mission to provide greater access to Pennsylvania students and their family to higher education. That's what that money is used for. For example, your honor... Well, what do we do about the provision in Pennsylvania law that I don't see a similar provision in Vermont or Arkansas law that said that the state devalues any liability? Well, that's not precisely what the, what the statute says. Let me answer that question very directly. Okay, I'll go to the statute. The statutes that, that provide that... Go ahead. I'm very sorry. I'm with you. The statutes that, that, that provide that the Commonwealth will not be responsible for a debt of FEA relate to its voluntary indebtedness. That is that when FEA takes on bonded indebtedness, and this is not unusual when a state allows a state agency to issue revenue bonds. Well, it's not in it, neither of the other two states. Fair enough. Maybe unusual, but of these three, it's sitting by itself. Well, there's, there's an entity in Pennsylvania called the State Higher Education, the State Higher Education System, which administers the state universities, which has the very same provision, but it is, it is, but it has been held in the Skian case that it is an arm of the state nevertheless. But the, the, the statutes that we're talking about, your honor, relate to voluntary indebtedness, principally bonded indebtedness, and it's not unusual... No obligation of the agency shall be a debt of the state, and it shall have no power to pledge the credit or taxing power of the state, nor to make its debts payable out of any monies except those of the corporation. Yes, your honor, and, and if, if I could point your honor to the sentence that the, the, the, the, remember it has the conjunction but, so the phrase that precedes that is absolutely applicable to voluntary indebtedness that FEA incurs. It says that when it, it does not allow the agency to pledge the full faith credit of the commonwealth, and that's typical in these kinds of financings, and that's because the bondholders look to the assets that secure the revenue bond. They do not look to the, the full faith and credit of the commonwealth of Pennsylvania. There is no statute, and Mr. Oberg has cited no statute that says that in the event that there is an involuntary debt, that is... What do you mean by an involuntary debt? I was just going to explain that, your honor. Excellent. An involuntary debt would be, for example, if Mr. Oberg were to secure a judgment in this case. That's obviously not a debt that FEA has agreed to take on. It is a debt that, it is a judgment that occurs as a result of litigation. There is not a statute that Mr. Oberg is pointing to, because there is none, that says that in that be a debt. I don't understand how that means what you say it means. Your honor, I would ask the court to put that in context in which it is, which is stated in the statute. That sentence begins, the board may, with the approval of the governor, borrow monies by making and issuing notes and bonds, and then it goes on to say, but no obligation the agency shall be a debt of the state. Right. It's clear to me that that but is a conditions, the preceding phrase that... The agency can borrow the money, but no obligation of the agency shall be a debt of the state. Exactly. That does not apply to a judgment that's that's obtained through litigation. But let me... Even added the, they even said that this, if this was, this was not severable from the rest of the statute, it was so important. And then it goes down further and says, all accrued and future earnings from the funds may be utilized at the discretion of the board of directors for carrying out any corporate purposes of the agency. Right. Any placements of such funds by then, say treasurer and depository, shall be consistent with guidelines approved by the board of directors. Correct. And the... It sounds like the board of directors are controlling No, your honor. The purpose of the agency that articulate in 5102, the purpose of the agency, which is the corporate purpose, is to improve the higher education opportunities of persons who are residents of the state. And the, the discretion, of course, by the board of directors is tempered by the very tight controls, the very tight fiscal oversight that the state treasurer has. All of FIA's money must be deposited in the state treasury. And by the way, your honor, in, in Maryland state and authority and Hoover, that was really enough to show that that's just exactly the opposite situation that we have here since the agency was the plaintiff in that case. And the agency is the defendant here. Well, your honor, I, and the super, not only the, our court, but the Supreme court has made that distinction, which you say doesn't, isn't important in your brief, but maybe you need to make new law on the Supreme court. Well, your honor, we, we, we hope not to make new law on the Supreme court. That's for sure. But let me just finish about one, just before you sit down one case that is, you mentioned in a footnote only in your brief, which is from the first circuit. And it seemed to me that it was the case that was closest on the facts to this case. Do you know what I'm talking about? I don't have a recollection of that as I stand here today, your honor. Okay. Well, maybe I can help you find it then. If you look at your brief and I think that you acknowledge that is close because the way in which you distinguish it is pretty minor. Shall I say it? It's a page 49 of your brief, I believe. And you say your lack of ownership and control distinguish the first circuit case where the state treasury engaged in only limited monitoring of board revenues and expenditures and no state intervention in the university stream, income stream. But in fact, in that case, as in this case, you had money coming in from, um, the pursuit of the entity university of Rhode Island there and going into the state treasury, but being earmarked only for Rhode Island, the state of the university of Rhode Island's activities and the first circuit held that, um, even not withstanding that university of Rhode Island was an arm of the state. That seems to me exactly like your situation. Well, I think what I think, it's just, he thinks first circuit is wrong. Well, I think what's critical about our situation, your honor, is how that money is controlled by the state. I mean, if you look at the other three factors, which, which we know that, and I understand your argument about the other, the other three factors. I think I get that. But with respect to this factor, the first factor is on all four. Well, I think that when you look at the test, as it was established by Maryland state and authority and Hoover, the test was twofold to meet this first requirement. And that is, was the money deposited in the state treasury? That's what Maryland state authority held because it was inuring to the benefit of the state because the state, the entity there was the plaintiff and the entity is the defendant. So you're looking at whether the state is going to be hurt in this situation, not whether this is inuring to its benefit, because it certainly isn't. Well, I disagree, your honor. I think that the critical factor here is the critical inquiry that the court framed. Okay. Is it subject to the state control and what is the state revenue at fiat deposit in the state treasury subject to strict oversight and control by the state? And it quite clearly is. That means very much. I've kept you longer than your time. Thank you, Mr. Hewitt. Let's hear from Mr. West. Good morning, your honors. May it please the court. I am John West. I'm here on behalf of the Vermont Student Assistance Corporation. The district court correctly concluded under the arm of the state test that VSAC was under sufficient state control to render it a part of the state. And I want to walk through each of the four factors that are a part of this analysis. And as to the treasury factor, it is important to focus on the state statute that Vermont as a state shall support and maintain VSAC. And to that end, Vermont has made annual appropriations to VSAC and provided funding each year of its existence. And in many of those years, there have been state funds that have been available to VSAC for its operations. Now, there were years when the operations and the revenue that VSAC was generating did not require that it use state appropriated funds for its operations. But in recent years, the last four and the state legislature has actually made as a part of its legislative grant of those funds, it is set aside that a certain percentage of those annual appropriations could be used for the operations and therefore are unrestricted funds. And the import of that is the first of all, that there are state appropriated funds that are unrestricted and held by VSAC that would be subject to a judgment if one was obtained by Mr. Oberg. In addition, it does demonstrate that over the course of VSAC's history, the state has had a relationship providing funds to the entity. And on particular years, those have been available to support and all of the net earnings of VSAC incur only to the benefit of the state. And the importance of this is that the assets and the money that VSAC holds at this time is ultimately the state's money. And so when addressing the critical question that this court must have on the treasury factor, we submit that there would be a detrimental impact to the state treasury of a judgment rendered against VSAC. Now, the second factor is the degree of autonomy, which the court has focused on. And there are several key indicators of the state's control over VSAC. VSAC's primary function is to issue debt to support its lending and its grant activities. And VSAC does not have the authority to issue any of that debt application without first receiving the approval in writing of the governor. There's also the indicia of control, as has already been noted, that the state controls VSAC's board. And out of the 11-member board, eight members of which are either current elected Vermont officials or appointees of the governor. And the chair of that board can only be appointed with advice and consent of the governor. Other indicia of control are that VSAC must file biennial reports to the legislature. It must file annual reports to the legislative educational committees. Its books and accounts are audited on an annual basis. And finally, the state has maintained ultimate control over this entity. And by statute, it has the authority to alter, amend, or otherwise change the structure, the organization, the programs, or activities of this entity, including the power to terminate the entity itself. And this demonstrates significant control that the state not only that this has maintained. There's the third factor that deals with whether Vermont focuses on state concerns. And yes, Vermont VSAC does do business outside of the state. But it is clear that its core function has not changed. And that function is to provide both lending services, but also educational opportunities for Vermont residents and others coming to school in Vermont. Do we know from the record here, from the public records, I guess they're cited, how much of the resources are used in Vermont? Your honor, I do not know whether that is broken. I thought it might be. In Pennsylvania, they had some annual reports that they filed. So we know something there. I'm not sure whether that is broken out in the record here. I'm not aware of whether that's in the record. Well, you would know, right? Yes, your honor. And so, I'm not able to cite that to you. But it is important to recognize that VSAC's lending program is available not only to all Vermont residents, regardless of where they go to school, even if they go to school out of state, but they also make loans to students from outside of the state who come to school in Vermont. And as a result, when those students go and finish school, VSAC continues to service those loans, regardless of where those individuals reside. And therefore, there are activities outside of the state. But those are a part of and support the core function that VSAC has, which we submit is clearly a state concern. And finally... I thought I had read in the papers that you were making a distinction between out of state and local. And you said that when we're talking about state concerns, we only look to see whether they are local concerns or state concerns. But you're not espousing that in front of us. No, your honor. It is the case... If you had all of your or 90% of your activity was centered out of state, that would show us that that factor did not weigh in your favor. Your honor, that would... Even if it wasn't a local. Correct. Yeah, we are not making the distinction of local versus state, although that has historically been something that courts have focused on because of the... I just want to be sure you understand my question. I had thought that you were making this distinction and saying it to be a state concern. All you look at was whether it's local or state, not whether it's state or out of state. No, your honor. We are not making that argument. Okay. So finally, the fourth factor addresses whether the state treats VSAC as an entity. And Mr. Oberg has argued that VSAC is not a true state agency within Vermont, despite the fact that that is not a defined term within Vermont state government. And VSAC does have a different structure from certain agencies within Vermont. Example is the Vermont Agency of Natural Resources, which was subject to the case in Stevens. But VSAC was established as a state agency, in fact, four years before any cabinet level agencies were created in Vermont. There are other agencies, the Vermont Department of Education, similar to VSAC, which are not designated as cabinet level agencies and are, in fact, governed by a board like VSAC. These differences do not make VSAC any less of a state agency, but they merely demonstrate that the legislature of Vermont has made a decision to establish its variate agencies in different ways. The state includes VSAC on its organizational chart, listing agencies of the state. It requires that VSAC's revenues and financial activities be included in the state's annual financial report. And all personal and real property of VSAC is exempt from taxation. These activities demonstrate that the state, in fact, does reflect that it treats VSAC... Mr. West? Yes. Your red light's been on for about five minutes. You're out of time. I'm sorry to cut you off, but... Yeah, I apologize, Your Honor. Mr. Connolly? Good morning. Tom Connolly on behalf of the Arkansas Student Loan Authority. With me is Mark Warrenbergen, Assistant Attorney General of the State of Arkansas. In its first opinion, the court noted that the critical inquiry is state control. And applying the arm of the state test, the Arkansas Student Loan Authority is unquestionably controlled by and part of the state of Arkansas. Let's look at the first factor, whether the judgment would be paid by the state. Now, the funds ASLA holds are all cash funds, which is a defined term in the Arkansas Code, referring to funds held by state agencies outside the state treasury. So ASLA's funds are by definition state funds. Those cash funds are subject to strict statutory control under Arkansas law. ASLA cannot spend any of its cash funds without an appropriation or other statutory authorization. And ASLA's 2009-2010 appropriations bill is in the joint appendix at 411 to 14. It makes clear that ASLA's use of cash funds in its own accounts is subject to appropriation, along with a host of other state statutes restricting spending, including the state Irregular Salary and Procedures and Restrictions Act, and other fiscal laws of the state. There's no question that the state clearly exercises direct control and dominion, and that ASLA's money is subject to appropriation restriction, audit and budget planning, and meets the requirements of Hoover and Maryland Stadium Authority. Let me address a question that Judge Motz asked in the first hearing, and one that Relater argues here. Relater tries to argue that there's no state law clearly making the state responsible for judgment against ASLA. That's because ASLA, as a state agency, is generally immune, at least in court, as part of the sovereign. And it's only in its contracts, like its state-approved bond indentures, where sovereign immunity is waived by statute, that ASLA can be sued in court. Under Arkansas law, claims against ASLA, like claims against other state agencies and the state itself, are referred to the State Claims Commission. And any award of the State Claims Commission over $12,500 is sent to the legislature for appropriation. So any federal judgment against ASLA would be sent to the Claims Commission, and then to the legislature for appropriation. There is no other mechanism under state law for a judgment to be enforced against ASLA. And I note that claims against municipalities, counties, and local school boards do not go to the Claims Commission. So claims against ASLA are handled exactly the same way as claims against the state. And to be paid, they go to the state legislature for appropriation. I think that's dispositive. Let's talk about the second factor. ASLA's creation and every significant... I thought that you indicated in your papers that the Attorney General represented ASLA. Correct, Your Honor. And that that was... Are you an Assistant Attorney General? No, Mr. Orenberger is my co-counsel. Yes. Yes, the Attorney General, the elected Attorney General of the state of Arkansas, Dustin McDaniel, is on the paper. So the only person that you can represent is the Attorney General hires you, is that it? The Attorney General... I mean, mustn't that be the case? I mean, the Attorney General represents... The Attorney General did authorize our approval, did authorize our hiring, and indeed in the appropriate... That's the only way that an outside lawyer could represent... That is in fact the only way an outside lawyer, that's in the appropriations bill in the appendix, ASLA cannot hire outside counsel without approval of the State Attorney General. ASLA has no taxing authority. It can neither raise funds nor spend them without express authority of the state. Its board of seven is all appointed by the Governor. They serve without compensation. There's no other level of state government that authorizes, that governs ASLA's activities. Every time ASLA issues a bond indenture, that bond indenture has to be approved by the State Board of Finance, made entirely up of state officials, the treasurer, the auditor, the director of finance, the bank commissioner, the governor. That must be then signed by the governor, who is in turn advised by the legislative council, made up entirely of sitting legislators. So indeed, ASLA's actions are subject to direct review and approval whenever the ASLA sells bonds, spends money, enters into contracts, sets its operating budgets, and sets salaries. On the third factor, I think, you know, in making the arm of the state determinations, the court has recognized that higher education is an area of quintessential state concern. And ASLA was established in the code as, quote, the instrumentality of the state, charged with a portion of the responsibility of the state to provide educational opportunities. That's the Arkansas Code. And looking at the last factor, you have extensive sites in the Arkansas Code, a gubernatorial proclamation, a decision of the Arkansas Supreme Court, and my counsel, the elected attorney general of Arkansas, all telling the court unequivocally that ASLA is a state agency. Now, against that backdrop, the court can only conclude that ASLA is exactly what the Arkansas Code, what the Arkansas Supreme Court, what the governor, what the attorney general, and most importantly, what the arm of the state test says it is, a state agency. Now, as to ASLA, this question is not even close. And for all the reasons set forth in our papers, the decision of the district court should be affirmed, unless the court has any other questions. Thank you. Thank you. Brian? Thank you, Your Honor. I'll be brief. I don't want to test the court's patience. Specific question was raised about the age of the decisions in Pennsylvania. Thank you. I think that what you have here are a bunch of recent, pretty recent, federal decisions that some of them, most of them are unpublished, but they go the other way. So if your case rises and falls on how the state court treats the other side, then I think you would, we would have to say it is an arm of the state. So I don't know that you want to spend a lot of time on that because that seems to me. No, I was just trying to, you asked me a specific question. When was the case decided? Yeah, but I can read that. Do you have any argument on the other three factors? Yes. And let me say, you know, as I said to you before, we're not saying that any single factor is determinative. This court did not make these factors are non-exclusive. I think we've got that. All right. And so then we're down to the two base questions. Is there going to be an impact on the state treasury? And you've heard FIIA say, well, there's nothing that says you, the other side have not proven that the state will walk away, but the burden is really different. Do these statutes say the state will pay? If you look at the statutes governing FIIA, the state disavows that responsibility expressly. And you pointed to that language. The control of the funds and the treasury is exclusively with the board of directors and they can be expended at the discretion of the board. That's how they've done it. That's what the statute says. If you look at Vermont, VSAC and that relationship, there's nothing and they have pointed to nothing that says the state will pay. They say, well, there's a general obligation to support, but no one knows what that means. That's entirely discretionary. So you cannot say on the statutes alone, the state will be placed at risk for a judgment. And then when you get to Arkansas, they have the remarkable argument that we're not going to pay. So if they're not going to pay, why are they here? What is the risk to Arkansas? If absent a discretionary decision by the legislature, they're not going to pay anything. What do you have to say with respect to the second factor, the autonomy factor with regard to Pennsylvania? Everybody on the board is appointed by the governor. And that has been true in other cases. And certainly in Hasse, the Supreme Court faced a situation where all of the directors were gubernatorial. I understand that. So are you just giving up on the autonomy factor? Is there any facts with respect to the autonomy factor? The self-sufficiency, which has always been a key to the autonomy factor. Are these, you know, because as you say, one part has always been the question, do you have taxing authority? But taxing authority is just a measure of being able to raise your own funds. All of these entities are self-funded. They don't need the financial support of the state. And in the case of VSAC, what they're talking about is a specific state grant program. It's an earmarked fund that they administer. And they were doing the state the favor of saying, we'll administer it free. But from time to time, they've said, no, the administration of that program has to be charged just the way a contractor would charge it for the overheads of that program. But all these major programs, which are their dominant activities, have no state funding involvement whatsoever. They're self-funded, highly profitable. Let me ask you again about the appointment of power here in terms of the board members in Pennsylvania. Do they automatically lose their position still? It used to be the case, I know, they automatically lost their position when they no longer held public office. Is that still the case? Well, you know, again, that's still the state's law. There are now appointees who are private persons. So they're not even in state office. Right, but all the state appointees. We haven't seen anything that changes that appointment. They are, in a sense, ex officio, the legislators. Now, whether the governor's appointments would lose their status, I think, is much more amorphous under that statute. But the legislative representatives are sitting, in effect, ex officio. But they're a minority. Can you talk to me about the third factor with respect to Pennsylvania? Well, certainly Pennsylvania has shifted its activities. So its dominant activities are outside Pennsylvania and are indifferent as to who is being supported by that activity. Because as we said, when they changed the nature of their business and they went into the ABS. What is the, is there a 2005 report? And what are the statistics in that report? Well, it's 30% or more of their revenue comes outside. At the end of the FFEL program, for example, where they're no longer making FFEL loans, almost all their revenue today is generated by their servicing the federal government supervision of its own loan. Don't we look at the facts as they were when you filed your complaint? And that's why we pointed to. You agree we do. I think that, yes, because we have to prove that the fraud was committed by a person. But what we showed. You have to allege enough to get. Ultimately. And I think I'm. A motion to dismiss. I agree. This case doesn't, even if you should win, this case doesn't necessarily go to trial. I certainly agree with you. What I'm saying is I think there's a difference here. Ultimately, we bear the burden of showing person. That's why the question is, have we plausibly alleged person status to go through the motion period at the they are free to contest ultimately whether we can prove that element by a preponderance. We're not walking away from that responsibility. But then we would have discovery. And I think what we've seen on the record is that they went into this enormous out of state, indifferent asset purchasing activity during the period in question. That's how they did it. And I think that what we pointed out in the case of is they tripled their base activity. They tripled their loan portfolio. So you now have two thirds of that portfolio held without regard to what it is supporting. It's an asset. You look at it in terms of what's its maturity. How is it going to feed and support the bond issues which are tied to it? You no longer ask the question, whose loan is it? It can be alone anywhere. It can be a loan in Hawaii to a student attending a university in Oregon. It has nothing to do with Pennsylvania. But it's a good asset. So when you change your business and you start looking for good assets, and the state certainly has no limitation on their ability to do that, that's a very different situation. And each of them at least doubled, and in the case of FIIA, tripled their portfolios. So they just radically revised the nature of the business. They had the latitude to do it under state law, and they did. So I think that to say that the dignity— I hate to cut you off, Mr. Reiner. I am. I'm going to ask the clerk to check to see if that red light can be seen from the other side. I think, unfortunately, Your Honor— We're going to come down and recalculate that.
judges: William B. Traxler, Jr., Diana Gribbon Motz, Barbara Milano Keenan